The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
August 1, 2019

**2019COA118**

**No. 18CA0865, *Gandy v. Williams* — Civil Procedure —
Amended and Supplemental Pleadings; Administrative Law —
Colorado Department of Corrections — Transfer of Foreign
National Offenders to Treaty Nations; Court and Court
Procedure — Inmate Lawsuits — Exhaustion of Remedies**

In this case, an inmate in the custody of the Colorado

Department of Corrections (CDOC) filed an application to be

transferred to Canada to serve the remainder of his sentence. The

CDOC's Executive Director denied the application, and the inmate

sought judicial review. The district court denied relief, and a

division of the court of appeals now affirms that decision. The

division holds that (1) while the CDOC's regulation entitles an

inmate to review of a transfer application by the CDOC's Executive

Director, the decision whether to grant the application lies within

the Executive Director's discretion; and (2) when exercising that

discretion, the Executive Director may decide that the inmate's need for treatment militates against an immediate transfer.

COLORADO COURT OF APPEALS         **2019COA118**

Court of Appeals No. 18CA0865
El Paso County District Court No. 16CV45
Honorable Eric Bentley, Judge

Robert D. Gandy,

Plaintiff-Appellant,

v.

Dean Williams, Executive Director, Colorado Department of Corrections; and
Travis Trani, Director of Prisons, Colorado Department of Corrections,

Defendants-Appellees.

ORDER AFFIRMED

Division VII
Opinion by JUDGE NAVARRO
Dunn and Berger, JJ., concur

Announced August 1, 2019

Robert D. Gandy, Pro Se

Philip J. Weiser, Attorney General, Nicole S. Gellar, First Assistant Attorney
General, Denver, Colorado, for Defendants-Appellees

¶ 1     Plaintiff, Robert D. Gandy, appeals the district court's order denying his motion to amend his complaint against officials of the Colorado Department of Corrections (CDOC) and closing the case. His complaint stems from the denial of his application to serve his prison sentence in Canada, his birthplace. We affirm. In doing so, we clarify that (1) while the CDOC's regulation entitles an inmate to review of a transfer application by the CDOC's Executive Director, the decision whether to grant the application lies within the Executive Director's discretion; and (2) when exercising that discretion, the Executive Director may decide that the inmate's need for treatment militates against an immediate transfer.

## I. Background

¶ 2     This is not Gandy's first appeal to this court. Like this one, his earlier appeals concerned his request to be transferred to the Canadian penal system. As discussed in *Gandy v. Raemisch*, 2017 COA 110, ¶ 2 (*Gandy IV*), Gandy is a Canadian citizen serving a habitual criminal life sentence in the CDOC's custody. *See also Gandy v. Colo. Dep't of Corr.*, 2012 COA 100 (*Gandy III*); *Gandy v. Colo. Dep't of Corr.*, (Colo. App. No. 07CA2381, Nov. 26, 2008) (not published pursuant to C.A.R. 35(f)) (*Gandy II*); *Gandy v. Colo. Dep't*

1

*of Corr.*, (Colo. App. No. 03CA1056, June 24, 2004) (not published pursuant to C.A.R. 35(f)) (*Gandy I*). He has argued that an international treaty addressing prisoner exchanges and its implementing statutes and regulations require CDOC officials to consent to his transfer to Canada. *See* Treaty on the Execution of Penal Sentences, Can.-U.S., Mar. 2, 1977, 30 U.S.T. 6263 (the Treaty); *see also* 18 U.S.C. §§ 4100-4102 (2018); § 24-60-2301, C.R.S. 2018; DOC Admin. Reg. 550-05 (AR 550-05). The CDOC has denied his applications.

¶ 3     In this case, Gandy filed a transfer application in September 2015. After it was denied, he filed a complaint in the district court against CDOC Executive Director and CDOC Director of Prisons (defendants). Among other claims, Gandy sought mandamus relief directing defendants to process his prisoner-transfer application according to CDOC regulation AR 550-05. The court granted defendants' motion to dismiss, and Gandy appealed.

¶ 4     In *Gandy IV*, a division of this court rejected most of Gandy's contentions but held that he had sufficiently stated a mandamus claim. The division concluded that the CDOC's regulation required the Director of Prisons to forward Gandy's transfer application to

2

the Executive Director, or his or her designee, for final review and decision. *Gandy IV*, ¶ 22. Because the Director of Prisons had not done so, the division reversed the judgment of dismissal on this issue and remanded to the district court to issue an order directing the Director of Prisons to forward the transfer application to the Executive Director. *Id.* at ¶ 43.

¶ 5 On remand, the CDOC amended AR 550-05. Applying the amended regulation, the Executive Director considered and denied Gandy's transfer application.[1] Defendants filed this new decision in the district court as an attachment to a status report. The court directed the CDOC to provide a written explanation for the new decision to Gandy. The Executive Director then issued the following memo to Gandy:

> It is the policy of the Colorado Department of Corrections to return convicted foreign national offenders to their country of origin consistent with the interests of the state of Colorado, the United States Department of Justice, and the individual offender.

---

[1] This decision was made by Rick Raemisch, the former Executive Director. His successor, Dean Williams, has been substituted as a party pursuant to C.A.R. 43(c)(2). The same is true with respect to the new Director of Prisons, Travis Trani.

3

A review of your criminal history, however, indicates a pattern of sexually deviant behaviors that require treatment. Per Administrative Regulation 700-19, the Colorado Department of Corrections provides specialized sex offense-specific treatment to offenders with identified needs to reduce recidivism and enhance public safety. While you are currently identified as ineligible for sex offender treatment due to not being within four years of your parole eligibility date, which is presently July 22, 2022, I expect and encourage you to participate in treatment when the opportunity becomes available to you.

Without treatment, returning you to your country of origin at this time is inappropriate and not in the best interest of the state of Colorado, the United States Department of Justice or you as an individual offender with untreated programmatic needs.

¶ 6      After defendants informed the court of the Executive Director's memo and asked for the case to be closed, the court solicited Gandy's view as to the further handling of the case. In response, he filed a status report asking for time to file an amended complaint challenging the latest denial of this transfer application. Shortly thereafter, he submitted a motion to amend his complaint. Defendants opposed his motion, arguing that his suggested amendments could not withstand a motion to dismiss and were

4

therefore futile under *American Civil Liberties Union of Colorado v. Whitman*, 159 P.3d 707, 712 (Colo. App. 2006).  Before the court ruled, Gandy again moved to amend pursuant to "C.R.C.P. Rule 15(a) and (d)," and he attached an amended complaint.  In addition to challenging the denial of his transfer application, his amended complaint alleged that defendants had unlawfully retaliated against him by relocating him to a less desirable facility.  Defendants again argued that the proposed claims were futile on the merits.

¶ 7    The district court denied Gandy's first motion to amend as moot in light of his second motion.  After receiving briefing on his second motion and considering his proposed amended complaint, the court denied it.  The court concluded that he had received all the relief ordered by the *Gandy IV* division and that "[t]o the extent Mr. Gandy now wishes to challenge Defendants' post-remand decision[,] that is a challenge to a new administrative action that should be brought in a new lawsuit, after exhausting the administrative remedies available to him."  In the alternative, the court denied the motion to amend because the proposed claims were futile on the merits.  The court closed the case, and Gandy appealed.

¶ 8    Because Gandy appears pro se in this court, we liberally construe his filings while applying the same law and procedural rules applicable to a party represented by counsel. *See People v. Bergerud*, 223 P.3d 686, 696 (Colo. 2010); *People v. Wunder*, 2016 COA 46, ¶ 16 n.3.

## II. Law Applicable to a Motion to Amend

¶ 9    Gandy first contends that the district court erred because he had a right to amend his complaint as a matter of course under C.R.C.P. 15(a). We disagree.

¶ 10    Gandy is correct that C.R.C.P. 15(a) permits a party to amend a pleading "once as a matter of course at any time before a responsive pleading is filed." He is also right that a motion to dismiss is not normally considered a responsive pleading for purposes of this rule. *See, e.g.*, *Grear v. Mulvihill*, 207 P.3d 918, 922 (Colo. App. 2009). Thus, defendants' original motion to dismiss in this case (prior to the appeal in *Gandy IV*) did not terminate his right to amend. The district court's grant of that motion and its judgment of dismissal, however, did so. A division of this court has explained the pertinent principle:

> Read literally, C.R.C.P. 15(a) gives the plaintiff an unlimited right to amend once as a matter of course before an answer is filed. However, when final judgment is entered before a responsive pleading is filed, the liberal approach of C.R.C.P. 15 must be balanced against the value of preserving the integrity of final judgments. *Therefore, if final judgment is entered before a responsive pleading has been served, the absolute right to amend the complaint as a matter of course is lost.*

*Wilcox v. Reconditioned Office Sys. of Colo., Inc.*, 881 P.2d 398, 400 (Colo. App. 1994) (emphasis added) (citations omitted); *see also Cooper v. Shumway*, 780 F.2d 27, 29 (10th Cir. 1985) ("A motion to dismiss is treated like a responsive pleading when final judgment is entered before plaintiff files an amended complaint. The final judgment precludes plaintiff from amending his complaint as of right pursuant to [a former version of Fed. R. Civ. P. 15(a), which was similar to C.R.C.P. 15(a)].") (citations omitted).

¶ 11     Consequently, Gandy's ability to amend his complaint after the district court entered final judgment and after remand from this court was subject to the district court's discretion. *See Civil Serv. Comm'n v. Carney*, 97 P.3d 961, 966 (Colo. 2004) ("This court has long recognized that trial courts may permit parties to amend pleadings in proceedings conducted after an appellate court's order

7

of remand.").  More precisely, the district court retained discretion to grant Gandy leave to amend the pleadings following remand from this court unless the amendment would contravene a mandate that expressly or by necessary implication precluded such amendment. *Nelson v. Elway*, 971 P.2d 245, 248 (Colo. App. 1998).

¶ 12    Defendants have never contended that the mandate in *Gandy IV* precluded Gandy's proposed amendments, and the district court did not so rule.  Rather, defendants acknowledge that the court had the discretion to grant Gandy's motion to amend.  In particular, they point to C.R.C.P. 15(d), which authorizes a court to permit "a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."  C.R.C.P. 15(d).

¶ 13    "Exercise of the trial court's discretion under Rules 15(a) and 15(d) is substantially similar and should be governed by the same considerations."  *Eagle River Mobile Home Park, Ltd. v. Dist. Court*, 647 P.2d 660, 662 n.4 (Colo. 1982).  "In deciding whether to grant a motion to amend, the trial court must consider the totality of the circumstances, balancing the policy favoring amendment against

the burden the amendment imposes on the other party." *Carney*,
97 P.3d at 966.

¶ 14    Appellate review of the trial court's denial of a motion to
amend is generally limited to determining whether the court abused
its discretion. *Id.* Where, however, a court denies leave to amend
on grounds that the amendment would be futile because it cannot
survive a motion to dismiss, we review that legal question de novo.
*Benton v. Adams*, 56 P.3d 81, 85 (Colo. 2002).

### III. Exhaustion of Administrative Remedies

¶ 15    The district court's first reason for denying Gandy's request to
amend his complaint was that he still had to exhaust his
administrative remedies challenging the Executive Director's post-
remand decision.[2]

¶ 16    "No inmate shall bring a civil action based upon prison
conditions under any statute or constitutional provision until all
available administrative remedies have been exhausted in a timely

---

[2] In their principal briefs, no party substantively addressed this
ruling of the district court. Thus, we ordered supplemental briefing
on the exhaustion issue. We thank the parties for their
supplemental briefs.

fashion . . . ." § 13-17.5-102.3(1), C.R.S. 2018. "Failure to allege in the civil action that all available administrative remedies have been exhausted in accordance with this subsection (1) shall result in dismissal of the civil action." *Id.*

¶ 17    In his first motion to amend his complaint filed in December 2017, Gandy said that he was still pursuing administrative remedies and he expected exhaustion to be completed in January 2018.[3] He thus asked for more time in which to file an amended complaint. (As mentioned, the court ultimately denied this first motion as moot.) In February 2018, he filed an amended complaint as an attachment to his second motion to amend. In his amended complaint, he expressly alleged that he had exhausted administrative remedies as to his new claims by then, and he gave details of his exhaustion efforts.

¶ 18    Accepting Gandy's factual allegations as true, we conclude that he stated enough to survive a motion to dismiss. *See* § 13-17.5-102.3(1) (providing that "*[f]ailure to allege*" that administrative remedies have been exhausted shall result in dismissal) (emphasis

---

[3] His motion actually stated January "2017," but he clearly meant January "2018" given that he filed the motion in December 2017.

added); *see also Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1259 (Colo. 2000) (when considering a motion to dismiss, a court accepts as true the plaintiff's allegations of material historical fact). This conclusion is especially apt given that defendants, in their opposition to his amended complaint, did not deny that Gandy had exhausted administrative remedies as to his new claims. Likewise, in their answer brief in this court, defendants do not deny that he did so.

¶ 19    In their supplemental brief, however, defendants argue that Gandy did not exhaust administrative remedies. Relying mainly on federal cases, they point out that a prisoner must exhaust administrative remedies before filing a court claim challenging prison conditions, as opposed to filing a claim and then seeking a stay to complete the exhaustion process. *See, e.g., McKinney v. Carey*, 311 F.3d 1198, 1199-1200 (9th Cir. 2002). Completing the exhaustion process before filing the claim is required because "corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." *Porter v. Nussle*, 534 U.S. 516, 525 (2002). But, according to Gandy's allegations in his amended

11

complaint, he *had* exhausted all administrative remedies prior to filing his amended complaint.

¶ 20   Even so, defendants maintain that he could not have exhausted administrative remedies as to the amended complaint because he was required to do so before he filed this action in 2016. Of course, it was impossible for him to do so because his amended complaint addresses acts that took place in 2017. And no one disputes that he exhausted administrative remedies as to the claims in his original complaint filed in 2016. The question here is whether Gandy also exhausted administrative remedies as to the new claims in his amended complaint. *Cf. Graham v. Maketa*, 227 P.3d 516, 519 (Colo. App. 2010) (recognizing that inmate may have exhausted administrative remedies as to one claim but not others). As explained, he alleged enough to show exhaustion at this stage of the litigation.

¶ 21   Hence, the district court erred by denying his motion to amend on the ground that he had not exhausted administrative remedies.

IV. Were the Proposed Amendments Futile?

¶ 22   We now turn to the district court's alternative rationale for denying the motion to amend — Gandy's proposed amendments

were futile on the merits. An amendment is futile if it "merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss." *Whitman*, 159 P.3d at 712. While a court accepts as true all allegations of material historical fact when assessing a motion to dismiss for failure to state a claim, the complaint must "state a claim for relief that is plausible on its face." *Warne v. Hall*, 2016 CO 50, ¶¶ 1-2 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

¶ 23 As the district court noted, Gandy sought to amend his complaint to assert five claims: (1) a request for mandamus relief under C.R.C.P. 106(a); (2) an Administrative Procedure Act violation; (3) an equal protection violation; (4) a claim alleging that the CDOC Executive Director violated his fiduciary duty; and (5) a claim alleging that Gandy's transfer to a less desirable prison violated the First Amendment.

## A. C.R.C.P. 106(a)

### 1. Mandamus under C.R.C.P. 106(a)(2)

¶ 24 Under C.R.C.P. 106(a)(2), relief may be obtained "[w]here the relief sought is to compel a lower judicial body, governmental body,

corporation, board, officer or person to perform an act which the law specially enjoins as a duty resulting from an office, trust, or station." Mandamus lies to compel the performance of purely ministerial duties involving no discretionary rights and no exercise of judgment. *Bd. of Cty. Comm'rs v. Cty. Road Users Ass'n*, 11 P.3d 432, 437 (Colo. 2000). It is appropriate only if (1) the plaintiff has a clear right to the relief sought; (2) the defendant has a clear duty to perform the act requested; and (3) no other remedy is available. *Gramiger v. Crowley*, 660 P.2d 1279, 1281 (Colo. 1983). Furthermore, mandamus is not appropriate unless all alternative forms of relief have been exhausted. *Id.*

¶ 25    Gandy asserts that, under the CDOC's regulation, he is entitled to be transferred to Canada as long as he has met the written eligibility criteria. He maintains that "the plain language of the regulation permitting transfer is mandatory." He is mistaken.

¶ 26    As pertinent here, AR 550-05 provides as follows:

> The DOC is delegated the authority by the governor of Colorado to approve the transfer of eligible foreign national offenders, pursuant to the conditions of current treaties which provide for such transfer, and the approval of the Department of Justice and the affected foreign country. Such transfer is a privilege

14

and not a right. The governor of Colorado or the executive director, at their sole discretion, may approve or deny the transfer of an offender.

. . . .

The director of Prisons will review the transfer application and accompanying recommendations and forward them with a recommendation to the executive director for final review and decision. If the executive director denies the offender's application, he/she will be ineligible for reconsideration for a period of two years. The offender will receive written notice of the denial. Exceptions to the two-year period may exist if temporary conditions preventing transfers have been satisfied.

AR 550-05(IV)(B), (IV)(D)(6). In the section addressing the "Eligibility Criteria for Transfer Consideration," the regulation lists seven conditions as well as a catch-all category: "An offender must meet any additional qualification criteria which treaty nations may require." AR 550-05(IV)(C).

¶ 27    AR 550-05 thus entitled Gandy to have his transfer application processed, reviewed, and decided by the Executive Director and to receive written notice if the application was denied. Because those procedures were followed here, the CDOC fulfilled its obligations under the regulation.

¶ 28     Still, Gandy contends that the denial of his application violated AR 550-05's stated policy, which is to

> return convicted foreign national offenders to their country of origin *consistent with the interests of the state of Colorado,* the United States Department of Justice, and the individual offender.  The DOC shall house offenders *consistent with their individual custody and program needs* and may reduce the number of offenders incarcerated in state correctional facilities.

AR 550-05(I) (emphasis added).  This policy, however, does not create a clear right to be transferred.  It requires the CDOC to weigh the public interest and the offender's interests when deciding whether to consent to a transfer.  And the regulation does not impose a clear duty to grant a transfer request.  In fact, it plainly states that "transfer is a privilege and not a right" and the decision to approve or deny a transfer falls within the "sole discretion" of the Governor or the Executive Director.  AR 550-05(IV)(B).

¶ 29     AR 550-05 comports with the CDOC's broad discretion over the interests of Colorado's correctional system, individual offenders incarcerated there, and their custody and program needs.  *See, e.g.,* *Reeves v. Colo. Dep't of Corr.*, 155 P.3d 648, 651 (Colo. App. 2007) (the CDOC has "broad discretion" over "the management of

16

prisons"); *People v. Watson*, 892 P.2d 388, 390 (Colo. App. 1994) ("[T]ransfer and placement decisions are purely administrative in nature and are 'left to the broad discretion of prison administrators.'" (quoting *White v. People*, 866 P.2d 1371, 1373 (Colo. 1994))).

¶ 30     Finally, Gandy does not point to any language in either the Treaty or Colorado's implementing statute that requires the CDOC, or Colorado generally, to consent to his transfer.  Therefore, the district court properly concluded that his proposed mandamus claim was futile.

2. Abuse of Discretion under C.R.C.P. 106(a)(4)

¶ 31     Gandy also alleged that the denial of his transfer application was "arbitrary and capricious," and an abuse of discretion. Construing his allegations liberally, he asserted a claim under C.R.C.P. 106(a)(4).  Under that provision, we may review "whether the [governmental] body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer."  C.R.C.P. 106(a)(4)(I).

¶ 32     Prison officials abuse their discretion if they misinterpret governing law.  *Brooks v. Raemisch*, 2016 COA 32, ¶ 32.  Absent

17

such a misinterpretation, a reviewing court must uphold a decision by prison officials if it has some support in the record. *Buenabenta v. Neet,* 160 P.3d 290, 296 (Colo. App. 2007). "The scope of judicial review in this type of case is very limited," *id.* (citation omitted), and we sit in the same position as the district court. *Brooks,* ¶ 33.

¶ 33 To the extent Gandy contends that defendants violated the regulation, applicable statutes, and the Treaty itself, we disagree. Under the Treaty, any transfer depends on the consent of the authorities that have custody of the offender. *See* Treaty, art. I(a), art. III, ¶ 3 ("If the authority of the Sending State approves, it will transmit the application . . . to the authority of the Receiving State."); *id.* at art. III, ¶ 5 ("If the Offender was sentenced by the courts pursuant to the laws of a state or province of one of the Parties, the approval of the authorities of that state or province, as well as that of the federal authority, shall be required."); *Gandy IV,* ¶ 8. Under 18 U.S.C. § 4102(6) (2018), the United States Attorney General is authorized "to make arrangements by agreement with the States for the transfer of offenders in their custody . . . ." Section 24-60-2301 provides that "the governor may, on behalf of the state and subject to the terms of the treaty, authorize the

18

executive director of the [CDOC] to consent to the transfer or exchange of offenders . . . ." *See Gandy IV*, ¶¶ 11-12. These authorities recognize that state prison officials have discretion to either grant or deny a transfer application.

¶ 34 Gandy contends that denial of his application due to his "untreated programmatic needs" violates the state statute and the Treaty because neither requires an offender to be "program compliant." But simply because those authorities do not expressly mention such a requirement does not prohibit prison officials from imposing it if they deem it consistent with the interests of the state and the offender. And AR 550-05(I) declares expressly that the CDOC shall consider an individual offender's "custody and program needs." So, Gandy has not shown that defendants misinterpreted the governing law.

¶ 35 Moreover, Gandy does not argue that the Executive Director's rationale lacks support in the record. That is, he does not deny that his criminal history indicates a pattern of sexually deviant behavior that requires specialized sex offense-specific treatment to reduce recidivism and enhance public safety. We have no basis to second-guess this determination.

19

¶ 36　To the extent Gandy contends that the Executive Director's rationale is manifestly arbitrary or unreasonable, we are not persuaded. Gandy appears to argue that, because he will leave Colorado if his transfer request is granted, Colorado officials have no interest in rehabilitating him. But this argument overlooks his own interest in rehabilitation, which the CDOC officials must consider. Furthermore, given that Gandy could be released from prison as early as 2022, it was not unreasonable for the Executive Director to conclude that it is in the public interest to treat him before he is transferred out of the CDOC's custody.

¶ 37　True, Gandy was not yet eligible for the treatment program at the time his application was denied. But, as defendants explain, Gandy would be eligible soon thereafter (beginning in July or August 2018). Thus, requiring him to participate in a treatment program before he could be moved to Canada was not an impossible or unrealistic condition.

¶ 38　Accordingly, even assuming the truth of Gandy's factual allegations, we cannot conclude that the Executive Director abused his discretion when denying Gandy's transfer application.

Therefore, his amended complaint was futile to the extent it raised a claim under C.R.C.P. 106(a)(4).[4]

## B. Administrative Procedure Act Claim

¶ 39     AR 550-05 outlines the process under which the CDOC Executive Director ultimately considered and denied Gandy's transfer application.  Gandy contends that, when promulgating AR 550-05, the CDOC failed to comply with the rulemaking procedures of section 24-4-103, C.R.S. 2018, of the State Administrative Procedure Act (APA), §§ 24-4-101 to -108, C.R.S. 2018.  As a result, he concludes that "the regulation must be deemed void in its entirety."  Once again, he is mistaken.

¶ 40     Section 17-1-103(1), C.R.S. 2018, provides that the Executive Director has the duty to "manage, supervise, and control the correctional institutions operated and supported by the state" and "[t]o develop policies and procedures governing the operation of the [CDOC]."  *See Dunlap v. Dep't of Corr.*, 2013 COA 63, ¶ 13.  "These

---

[4] In his proposed amended complaint, Gandy alleged that the Executive Director had violated section 24-18-103, C.R.S. 2018, which imposes a fiduciary duty on public officials.  Because he does not discuss this claim on appeal, however, we deem it abandoned. *See People v. Osorio*, 170 P.3d 796, 801 (Colo. App. 2007).

duties are undeniably broad . . . ." *Id.*; *cf.* § 17-1-105(1)(a), C.R.S. 2018 (Executive Director has power to transfer inmates). Section 17-1-111, C.R.S. 2018, states that the provisions of title 17 "relating to the placement, assignment, management, discipline, and classification of inmates shall not be subject to section 24-4-103, 24-4-105, or 24-4-106" of the APA.

¶ 41 Gandy says this exemption from compliance with the APA does not apply to AR 550-05 because it does not concern placement, assignment, management, discipline, or classification. We agree with defendants, however, that the transfer of an inmate from the CDOC's custody to a foreign nation's custody involves the placement or management of an inmate. Therefore, the plain language of section 17-1-111 includes AR 550-05. *See Wisdom Works Counseling Servs., P.C. v. Colo. Dep't of Corr.*, 2015 COA 118, ¶¶ 42, 49-50 (recognizing that "management" has broad meaning in section 17-1-111). We are not persuaded otherwise by the fact that the Executive Director's authority to consent to an inmate's serving a sentence in a foreign nation derives in part from section 24-60-2301. *See Dunlap,* ¶ 11 ("[T]itle 17 includes broad and extensive provisions concerning the authority of the Executive Director . . . to

22

administer sentences imposed by the courts. Thus, the fact that the source of the authority to carry out a death sentence is found in section 18-1.3-1204 is not dispositive of whether the regulation relates to a matter within title 17.") (citations omitted).

¶ 42 In sum, because Gandy's APA claim would not withstand a motion to dismiss, the district court correctly denied his proposed amendment as futile.

## C. Equal Protection Claim

¶ 43 According to Gandy, denying his transfer application on the basis that he has not yet completed a sex offense-specific treatment program violates his equal protection rights because he "is being treated more harshly than a person convicted of a violent offense." He says that a violent offender would be eligible for transfer before him because such an offender would not be required to complete a sex offense-specific treatment program (and thus could be eligible for transfer earlier than four years before his or her parole eligibility date).

¶ 44 We agree with defendants, however, that Gandy failed to state a claim upon which relief could be granted because he is not similarly situated with a non-sex offender. "[A] defendant is only

similarly situated with defendants who commit the same or similar acts[.]" *People v. Fritschler*, 87 P.3d 186, 188 (Colo. App. 2003). Therefore, the Equal Protection Clause did not prohibit the CDOC from deciding that Gandy has different programmatic needs than an offender without a history of sexually deviant behavior. The district court properly concluded that Gandy's equal protection claim was futile.

### D. First Amendment Claim Based on Retaliation

¶ 45    Gandy contends that defendants unlawfully retaliated against him for his continued filing of legal actions. Specifically, he argues his transfer from the Colorado State Penitentiary (CSP) to the Colorado Territorial Correctional Facility (CTCF) was in retaliation for his constitutionally protected activity.

¶ 46    A viable claim of retaliation in violation of the First Amendment must plausibly allege three elements: (1) the plaintiff engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse actions were substantially motivated by

the plaintiff's exercise of constitutionally protected activity. *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

¶ 47    Defendants do not contest that Gandy satisfied the first element. So, we turn to the others.

### 1. An Injury that Would Chill a Person of Ordinary Firmness from Continuing to Engage in Protected Activity?

¶ 48    The question of a chilling effect on a person of ordinary firmness is an objective inquiry that a court may decide as a matter of law. *Id.*

¶ 49    Gandy maintains that the move to the CTCF would have such a chilling effect because it is a "less desirable facility" than the CSP. Taking his allegations as true, the transfer to the CTCF resulted in his losing some privileges and economic opportunities. At the CSP, Gandy crocheted items that he sold to staff members or donated to charity. Because the CTCF does not offer "a program where an offender can legitimately sell hobby products to staff members," he "had to send out multiple skeins of yarn intended to be used in future projects, as well as various unfinished projects," resulting in a loss of over $100. In addition, Gandy, age sixty-three, is now assigned to the top bunk of a two-man cell on a third floor without

25

elevator access. He has "slipped twice attempting to descend from the top bunk."

¶ 50     "[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Green v. Nadeau*, 70 P.3d 574, 577 (Colo. App. 2003) (citation omitted). Thus, "[t]he supervision and management of the internal procedures of correctional institutions are within the discretion of institutional officials and not subject to judicial scrutiny absent exceptional circumstances." *Id.*; *see also Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) ("[I]t is not the role of the federal judiciary to scrutinize and interfere with the daily operations of a state prison, and our retaliation jurisprudence does not change this role.").

¶ 51     Generally, limiting an inmate's privileges is not deemed a sufficiently serious consequence to chill a person of ordinary firmness from continuing to engage in protected conduct. For instance, in *Rocha v. Zavaras*, 443 F. App'x 316, 317 (10th Cir. 2011), an inmate alleged that, in retaliation for complaints, he was placed on "restricted privileges" status that limited his access to recreational activities, caused him to be assigned to segregated

26

housing, delayed his calls to the cafeteria, restricted his canteen purchases, prevented him from contacting other inmates, and required him to wear distinct identifying clothing. *Id.* Then, "due to the prohibition on communication, he was injured during a work project, requiring eight stitches and additional bandages." *Id.* Yet, the court ruled that he had "failed to allege facts necessary to support the element that any defendant's actions 'would chill a person of ordinary firmness from continuing to' file grievances or exercise a constitutional right." *Id.* at 319 (citation omitted).

¶ 52    Similarly, verbal harassment and name calling, while unprofessional and unpleasant, do not constitute adverse action sufficient to support a retaliation claim. *See Requena v. Roberts*, 893 F.3d 1195, 1211 (10th Cir. 2018).

¶ 53    On the other hand, "common sense leads to the conclusion that being taken out of the general population and placed in twenty-three-hour-per-day confinement in retaliation" for constitutionally protected activity "would deter a reasonable inmate from exercising that First Amendment right in the future." *Montoya v. Bd. of Cty. Comm'rs*, 506 F. Supp. 2d 434, 448 (D. Colo. 2007); *see also Allen v. Avance*, 491 F. App'x 1, 6 (10th Cir. 2012) ("The

27

prospect of punishment severe enough to satisfy the Eighth Amendment is sufficient to 'chill a person of ordinary firmness' from exercising his constitutional rights.").

¶ 54    Considering the circumstances, we conclude that Gandy's allegations — that he lost some privileges and income due to his transfer and must sleep on the top bunk in a third-floor cell — do not assert adverse action sufficient to support a retaliation claim.

¶ 55    Even assuming, however, that his transfer to the CTCF was an act that would chill a person of ordinary firmness from continuing to petition the courts for relief, we conclude that he failed to satisfy the third element of a retaliation claim.  We turn to that issue next.

### 2. Was The Transfer Substantially Motivated as a Response to Gandy's Exercise of Constitutionally Protected Conduct?

¶ 56    An inmate "is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity."  *Peterson*, 149 F.3d at 1144.  Therefore, the inmate "must prove that 'but for' the retaliatory motive, the incidents to which he refers . . . would not have taken place."  *Id.* (citation omitted).

¶ 57    Gandy contends that the timing of his transfer reveals retaliation. He asserts that the CDOC transferred him about two months after the *Gandy IV* division ruled in his favor in part. But, while Gandy alleges that the transfer was retaliatory, he also says that the CDOC claimed to transfer him "for programming purposes" (i.e., to allow him to participate in a treatment program). He claims that this stated reason for his transfer was not enough to justify the move because CDOC officials "admit that he was not eligible for the programming he was ostensibly being transferred for."

¶ 58    As discussed, however, Gandy was due to become eligible for the treatment program shortly after the transfer. And it makes sense that prison officials would transfer him ahead of his eligibility date so that he could begin the program as soon as possible when he became eligible. Given this treatment-related reason for his transfer, Gandy did not plausibly allege that, but for the alleged retaliatory motive, he would not have been relocated to the CTCF.[5]

---

[5] Indeed, this treatment-related reason for the relocation is more consistent with the timing of the transfer than any alleged retaliatory motive. Although Gandy has filed many legal actions against the CDOC over several years, he was not transferred until shortly before he became eligible for the treatment program.

29

¶ 59    To sum up, we conclude that the district court correctly decided that Gandy's proposed amendment adding a First Amendment retaliation claim was futile.

## V. Conclusion

¶ 60    The order is affirmed.

JUDGE DUNN and JUDGE BERGER concur.